The first case today is number 24-1467, United States v. Eric Robert Johnson. At this time, would counsel for the appellant please introduce herself on the record to begin? Good morning, and may it please the court. I'm Chrissy DeMasso, and I represent Eric Robert Johnson. I would like to reserve three minutes for rebuttal. Okay, you have three minutes. Thank you. FreeNet is an internet-based program that describes itself as censorship-resistant and is providing strong privacy protections. It attempts to make it impossible to connect any user's activity on FreeNet to that user's IP address. Rather than file sharing, it is a peer-to-peer program built on principles of anonymity. For years, the government— I think we understand how it works. And although they talk about privacy, they also warn that with a modest effort, somebody may be able to discover your identity. So with that warning in place, how is that a reasonable expectation of privacy? I think the warnings need to be taken in the entire context of both FreeNet and also sort of internet and peer-to-peer usage more broadly. So FreeNet does have those warnings, and one of the warnings is simply telling the user that your IP address will be revealed. FreeNet is not blocking—you know, it's not providing anonymity by blocking IP addresses. It's providing anonymity by making it difficult to connect activity to the IP address. And that information is also clear. When you read the rest of the material, it talks about being censorship-resistant, privacy-protective, providing anonymity. The government's expert talked about how FreeNet does this. But they give you a dark web option that would make it harder, and your client chose the more free FreeNet that made it easier. But Mr. Johnson also chose FreeNet, which is far different from the internet generally, which is far different from other peer-to-peer options. One of the warnings in FreeNet— How is it different from other peer-to-peer? I'm sorry. How is it different from other peer-to-peer options, as you say? In typical peer-to-peer options, users allow files to be completely shared. There's sort of a folder on their computer that anyone who has that program—you know, LimeWire, Nutella, all those programs—can just come in and simply take the file. So in your typical peer-to-peer case, you have an officer going in and taking a complete file from someone's computer that they made available to anyone. What FreeNet does is it, when people put files in, it separates the files into blocks and encrypts them. So no one who has FreeNet is storing a complete file, a complete shareable file on their computer. They're storing encrypted blocks that they do not even know the content of. They don't see the blocks. They can't tell what's in them. They have no idea what it is. So when someone then goes to get a file out of FreeNet, FreeNet is reaching out to all of those computers, all of those nodes, to pull the file together. So in your typical peer-to-peer case, the rationale is typically, well, this person is making this file available. This file is available publicly. Anyone who has LimeWire can pull this file. So it's being shared, and therefore, it's being sort of voluntarily disclosed to this larger network. That is not happening in FreeNet. In FreeNet, users do not voluntarily share the information that the government needed to pierce FreeNet's privacy protections. Mr. Johnson did not voluntarily share all of the data that was required to run all of these formulas, to figure out how many times his requests had been passed along. He simply did not make voluntarily available all of the information needed. And that's the warrantless search, is that the government is going in and is pulling out information that Mr. Johnson did not voluntarily share, and it's doing so without a warrant. I guess, even if I accept all that, like, if you really simplify this case, the question on the warrant is, is there a reasonable expectation of privacy, right? Did your client have a reasonable expectation of privacy in the information? And I think then you go to Judge Thompson's very first question, which is, he was told when he was using FreeNet that the information wasn't private. So, how do we get around that? I think what, first of all, part of what he's told is simply your IP address is out there. That's not enough to get the government probable cause here. If his IP address is out there. It says your IP address is not private, but a third party with, who makes a reasonable effort could find out your identity. That's part of the warning also. I think the key thing here is finding out your identity in connection with what you're doing. Because FreeNet is also telling people that that is protected. What you are doing is protected. It's not so much that your identity as a FreeNet user, your identity as someone whose node may have passed along a request, your identity as the person who requested a specific block that contains specific information is what FreeNet is attempting to protect. And the government's expert, who is the person who, you know, created this modified FreeNet program, he talks about how FreeNet succeeds. Like FreeNet does create anonymity. It's not perfect. There was a way to, you know, for him to get in and conduct this search program that enabled the government to investigate in a context where they were not previously able to investigate. Right? The government prior to modified FreeNet is not able to successfully investigate FreeNet because it is successfully anonymized. So without the program, the government would, you know, without this program, the government's advice to serve to FreeNet, no, the government couldn't even investigate anything in FreeNet. Here we're talking about, you know, pornography, but it could be drug transactions or anything else. And if we were to accept your premise here, then government couldn't do like, you know, the type of searches or obtain warrants. And again, there could be information about arms dealing, transactions, terrorism. It would all be protected. Would that follow? Is that correct? I think the Fourth Amendment protects situations in which people have a reasonable expectation of privacy. It protects, all the time, protects situations in which it means that the government needs to get a warrant to go further or needs to find probable cause to go further. They didn't have a warrant to use modified FreeNet here. Okay. But what I'm sort of suggesting is the way FreeNet is said, if we find that there's that reasonable expectation of privacy and we find that your client is correct, then anybody who asks information in FreeNet would be barred from a government search. The government would need to get a warrant to use modified FreeNet. Whether they could come up with other, you know, investigative techniques or they could come up with reasons to get warrants, I think that's very possible. But in this case, they did not have a warrant to use modified FreeNet. And the warrant that they ultimately got to search Mr. Johnson's home relied entirely on this warrantless search. So you know. It sounds like they opted, the client opted not to take the dark net. That's right. The record, you know, shows that he must have been using, sort of what's in the record is that he must have been using OpenNet because that's what the government says that they run their note on is OpenNet. He's still, again, he is still choosing to use FreeNet. So yes, he's not making this choice to use dark net. And there's testimony that dark net almost doesn't even work, that it's sort of not a real option, that there simply aren't enough, there's not enough use of it. It's very difficult technology to make that extra piece of security work. But Mr. Johnson, by choosing FreeNet, is still choosing a high amount of security. And you see the, there's an effect to that. Like he pays a price for that, right? FreeNet, there's limited, there's less content on it. It's slower. Individuals don't always get the files that they request. So the Supreme Court has announced this idea of a whole of movement. I don't see that here. They're not monitoring the whole of his movement. And they don't care, for instance, if he is looking for used automobiles. So they're not monitoring everything he does on FreeNet. It's only this one particular something that triggers, well, it's one particular something anybody can do, that he has a warning, he has an option, and it doesn't seem to fit within any of the cases that articulate this whole of movement idea. I think the way that the whole of movement cases come into play here has to do with sort of, you have to look at the entirety of what the government was doing here. So they are broadly surveilling FreeNet over a period of years. And they're gathering, in order to sort of pierce FreeNet's privacy protection, they are gathering a substantial amount of data about him. And so Carpenter and those type of cases are talking about sort of what gets revealed and what's the... They're gathering data about what nodes trigger a likelihood that pornography is being transmitted. They're sitting looking for him in particular. They're looking for pornography. Does it matter here, he sends the request in, right, through FreeNet, request for this type of material. That is then sent to the government from your client. Yes. So the request gets sent, but what the sort of government node, what a typical user node does not know is whether that's an initial request or a relayed request. So a typical FreeNet user who downloads FreeNet and just has it sitting on their computer, requests will come in through their computer sort of without their knowledge. They don't... They're not... See them, they're not asked about them, it's just block requests come through. They can see the IP address of the people they're connected to, they can perhaps see what the sort of encrypted code for that block is, but they don't know whether they're receiving the first request for something or a relayed request for something. Does that really matter? It does. Why? Because if Mr. Johnson's computer was simply relaying requests for child pornography, then there's no probable cause to believe that he was actually in the end of it receiving a file containing child pornography. So the government does need to show not only that his IP address is on FreeNet and that his IP address is connected to a block that contains child pornography, they need to show that he initiated that request. Otherwise, there's no probable cause to believe that he will end up with a file that itself is child pornography. So that key... It really is key that they have to also show that the person who's being... The person under suspicion in this particular case, that they were the initial requester of these blocks. That's a critical piece. And that's where this additional data needs to be brought to bear, that they need additional data that he's not publicly sharing. It's not the block number. It's not his IP address. It's all this other data. When you look at the formula... Has any other court of appeals found merit to this argument, or is this a case of first impression? It's certainly a case of first impression in the First Circuit. The Eighth Circuit didn't talk about the warrantless aspect of the search. They sort of just looked at the warrant on its face. It was not... Let me ask you. Judge Casper below cited a case, and it's analogizing what happened in this case to, like an L quote, that in using FreeNet Roundup, the agents, and the quote is, act like an undercover officer crashing a public meeting. Why is this different from an undercover crashing a public meeting? I think that goes back to my question, my answer to Judge Montecavolo's question, that he is not sharing publicly all of the information that the government needs to perform this  So the government is going in and warrantlessly searching and gleaning information that he's not publicly sharing, that he's not announcing in a room full of undercover officers. And that's the really critical piece here, is that there is this additional information. Is that actually critical in... I mean, he's using a publicly available resource on the internet. Like, does the distinction you're making really matter? I'm sorry, what? The distinction you're making that some of the information he's putting into FreeNet is not publicly available. Yes, I think it does, because the government, in order to sort of apply these formulas and apply this higher analysis, needs to be applying it to information that they obtained lawfully. And so they have to show that all of the information that they used was obtained lawfully. And where they cannot do that, this was a warrantless search. Thank you. Okay, thank you. Mr. Crum, and I hope you're doing much better. Randall Crum on behalf of the government. The government believes this can be resolved very straightforwardly on the nature of the warnings themselves, which stated to the defendant when he chose to download and operate FreeNet that anyone with moderate resources could trace his activity on FreeNet back to him. So not only identify him, but trace his activity back to him. In the face of that, he initiated a request for child pornography that the law enforcement node passively received, like any other participant in FreeNet, and using the information contained in that and other information they've awfully had, identified him. That is probably unsurprising to anyone that the government has at least moderate resources and the government could be a participant in any public forum like FreeNet open that. And in some sense, that renders it for us a very straightforward case. To try to make it less so, the defendant makes some arguments about whether the government in fact had this information lawfully, and it's worth stepping through some of those arguments merely because I think the technical details that were not developed at length in the opinion of the district court, but are sort of important in understanding how what really happens here. It's been described how it breaks stuff into pieces and then a person requesting FreeNet gets a key to do so from a publicly available source or a message board, sends that out into the world. It goes to the network of the user's peers. That request itself contains the hash value of the requested file and it also reveals the IP address of the requester and it also reveals this counter called hops to live which shows how long this particular request has been propagated. Is there a difference between initiating the request and relaying the request? I think that came up. Those three things happen at each step. Whether it's an original request, it will contain those information. It will contain the IP address of the next adjacent computer. That's why it doesn't tell you the ones further down the chain, but it will tell you the computer that's requesting this file piece from me is this computer. It tells me it is the hash value of this file piece and it tells me how long this is propagated in general terms by this hops to live counter. This comes to every computer down the chain using only that information. FreeNet Roundup compares it to a database of known files. Those are lawfully obtained. Those are obtained by and this is in the record and I have a cite for it if it didn't make it into my brief which is that the files are this is JA 134-135 all the files that are in the library were obtained by going to public message boards and the government finding what kind of files are being shared on FreeNet and finding how they're broken up and it learns that information lawfully and unrelatedly to this person. So the second step is it simply makes that comparison. At that point if the comparison is not positive, if there's no block of child pornography, the request is dropped. The only thing once it's identified that it is and we really have evidence of a crime in progress seeking child pornography, the formula and the additional steps happen again using information that comes to the government as an ordinary part of FreeNet and that is the one additional piece of information is the number of peers of the requesting computer and that is also provided and this is JA 159 to 162 provided to every computer. So everything the government uses as a suggestion that it isn't is either lawfully obtained from public sources to create the library or inherent in the request to ordinary operation of FreeNet. So there's no sense that something else is happening. Yes, it's automated, it's done more quickly than a person could do it by hand, but Dr. Lien in some of the testimony showed that you can make a rough determination of these things from the information you get in debug mode, it's just faster. So does the government get involved only if a request happens to hit your node? Absolutely, again there's no preferential treatment there's no advertisement of child pornography on the government node to attract traffic it is simply a participant like any other. So you get some but not all. Many pass by and the only ones that are captured, not only every piece of child pornography but only those that are in the library. If you happen to have some new document that the government has not yet detected on the publicly available boards and added to the library, that passes through too. So there's no question that other information is not being detected that's why we say Jacobson field test case where the only thing that the government test does is a binary decision, a contraband or not, that has been held not to be a search and that's what's happening here. If it's not a piece of known child pornography file, it passes on and the government node like any other it delays the request and refers the piece of the file back to the person who is requesting it like any other node. The one other piece I just want to address because it was mentioned in the response here is the longevity of the time because that's simply not true that this requires over a long period of time involves long term surveillance it may be true that collecting the library takes a period of time but that's from public available sources and the defendant really can't complain that we took some time to put together a library of known child pornography files on Freenet. The part that involves him, for this particular case, the word update shows that there were simply three requests over a short period of a few days that triggered the desire to seek a warrant and to search his residence. Second, in fact the record shows and the testimony shows you don't even need three, you need one because what it searches for is the number of blocks of this file versus the expected number of blocks of that file using various known information like the number of peers and predicted information within the formula about the number of peers of earlier parties to sort of make an idea whether this number of requests with respect to this number of pieces means it's the originator of this file. So in fact there's no surveillance over a period of time this can be done with a single request although it's practiced to allow three hits before seeking a warrant to make sure it's not an accident. What do you get the keys from? So the keys are part of the publicly available information and Your Honor, thanks for asking me that and to specify that particularly, when the government finds a message board publicly available on Freenet that somebody has child pornography files, that gives them the key. That is the key that allows them to retrieve the file. So what they then do is they retrieve the file, put it in the library they have the key and which tells them, which is also called the manifest but it tells them the number of pieces and then they retrieve those pieces and so they have the file, they have the pieces and they have the manifest or key so that is all the information they obtain separately. And this is publicly? Well it's on the Freenet's messaging boards which are available to open end users of Freenet so it's publicly in that sense. You have to be a Freenet user but they're shared on message boards and places where they're able to be found. As I understand some of the defense argument at least today it is that the defendant didn't make available some of the information the government got in the warrant. So it didn't make available I guess to the public that the government then had to do more work to get information that wasn't made public. Is that how you understand that argument and how would you respond to that? Well I guess there's two parts to that. One is what I was trying to say in outlining the way it works but I think that's technically wrong which is to say the information that's used in addition to the hash value, in addition to the IP address that's used to run the formula to determine this are in two parts it's the library which is created by the government and I don't think he can complain that, yes I don't run my own personal library of pornography to match it to but I don't think he can complain that the DNA database cases suggest that the government can collect a reference database and the other is that the information he complains about the information about the number of peers which is also used in the formula is information that Freenet by it's ordinary operation of the testimony says this reveals to a specific computer. So I know who's sending it to me, I know how many peers they have I don't know their IP addresses but I know them, how many and their IP address and I know the file and I know essentially how far it's propagated. Those are inherently the requests. So to the extent he's arguing those who weren't then that's technically wrong. To the extent the argument is that he didn't understand that those things were sort of under the hood of how this operates, again I don't think that's the way the law works if he misdirected an email to what turned out to be a government informant or directed it intentionally to somebody who turned out to be a government informant the fact that the government has better resources to analyze the email and be able to figure out what a spoof name is that actually belongs to somebody else whereas I as a recipient of the same email might be fooled isn't a search because the government ordinarily has greater interest and greater resources and once the person has lost control of it and sent it out into the world they don't retain the ability to say you know the government read something into my message that I did not think they would find because I didn't think they would take the time to choose what the argument amounts to. Let me ask you the same question I asked opposing counsel. Is this or is not this like an undercover officer crashing a public meeting? Well I think it is because of the relatively public nature of how this goes out I would say it's a little more analogous to a situation of somebody who sends a blast email to members that he believes are members of his gang revealing information, some of it observable, some of it maybe in code and it turns out one of the recipients is in fact an informant or he's mis-mailed it entirely and it goes to the government itself at that point I think that's the situation we're in. Thank you. Anything else? I guess maybe one more and I would just add that the attempts to sort of analogize or distinguish it from the case of regular peer-to-peer file sharing and the government would argue that comparison if anything would cut in the government's favor in one sense which is that a peer-to-peer file sharing you open your computer to somebody else to come and look at the files you have. This request sent affirmatively out into the world into a network of what Freenet tells you includes strangers to you and at that point I think it's very difficult to say that when you send a message voluntarily as we say the government received it as an intended recipient as a Freenet note, it was the intended recipient, at that point it's difficult to say that you possess it and I think perhaps even more so than somebody who simply makes the file open to somebody the government still has to go and find it. Here the government got it. Thank you counsel. One other question based on what you just said. In a regular file share you said that someone leaves their computer open to other users is the person with the open computer do they still nonetheless have to make a request for pornography if they want to receive it? Well the person who wants to receive it, the cases are often people who are on the other side of the sharing platform. So the government, somebody put a directory and the government goes and finds it but that's an affirmative act of the government. What I guess was trying to draw the distinction that maybe favors the government's position here is that here it's an affirmative request that he's making that the government passively receives rather than a request that the government is making to somebody's available computer. But in both cases it's being made available in a public way. Yeah I mean I guess the distinction you're making is the government sort of sitting there receiving the request rather than going out and soliciting it. Right and that's what we make much of the fact that it's essentially a passive program. There's nothing that Pre-Net Roundup does prior to the analysis of what it gets that's any different from what any pre-known rate node gets and sort of has to get in order for the whole system to operate. It's simply participating in the network like anyone else. Anything that happens different happens to the point where all of this information has been sent, has been received and then there's some additional technical steps that happen to match it and then to determine whether a person has originated. But the government, it really is like somebody just directs a package of drugs to the station house doorstep. It's rough. The question is what can the government do now that it has and we believe that none of this, what happens afterwards would render this absurd. Thank you Counsel. Thank you Counsel. At this time would Counsel for the Appellant please reintroduce herself on the record for her rebuttal. Chrissy DiMasso for Eric Robert Johnson. From the questions that were just going around I think there's an important issue here about what was publicly available through Pre-Net and I think an interesting way to reframe this is to think about what a normal user of Pre-Net would see. So sort of at the very first level, normal users of Pre-Net don't even realize if they're receiving requests. It's just, it's not, the program does not ping them, it's not made available to them, it just happens behind the scenes. And then sort of a second level is if they do go and look, understand there's a picture in the government's exhibit one, which is at like JA 755, that has sort of a picture of the overall kind of interface of Pre-Net and there's a picture where you can see that a user could kind of see the IP addresses of people connected to, possibly could see the block requests, but you don't see the user seeing all of this background information. So what the government was able to see a regular user would not be able to see? So when you, I think there is a technical question here and I think that, so a regular user you don't see on that interface, you don't see a picture of like the hops to live count, you don't see a picture of all of this kind of various node information that's in the formula that's on page seven in my brief. The government has sort of referenced, well debug mode might be able to provide all that information. Well the testimony about debug mode is equivocal, sort of ambiguous about what it is, how does a user get to it. And I think it's really important that, the reasonable expectation of privacy test depends on what you can actually expect others to do. So you look at a case like Bond, like Jardines, like Kylo, like what could that person, I think about the person on the bus in Bond, what are they expecting their suitcase is up there, but what are they expecting other people to do to it? So when it comes to this technical question, sort of what a user normally saw versus what a user, a highly sophisticated user could possibly do if they had substantial resources, I think are important distinctions and important questions. And the district court really didn't get into this. The district court really did not get into debug mode. But it didn't, it said moderate resources. Your brother counsel is talking about the government having substantial but the warning at least says a third party with moderate resources. I mean returning to the warning. It would just be brain resources. Computer skills. Returning to the warning, I think that first of all, computer skills would not be enough. Because there does have to be this additional sort of knowing what the blocks contain, having the ability to monitor enough requests to find it. And I think again the context in that warning is on JA 755. And it's saying that but it's saying that in the context of saying this is much safer than other peer-to-peer. So it's like these programs are sort of attempting to build more and more and more privacy protections. And perhaps there's no perfect privacy protection in any context. But he's still, the fact that he is trying and using a program that has costs to use it does reveal that despite these warnings, in the overall context, he has a reasonable expectation of privacy in his use of this program. Thank you. Thank you counsel. That concludes argument in this case.